[No. 30178-8-III. Division Three. January 31, 2013.]

SPOKANE COUNTY ET AL., *Respondents*, v. THE EASTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, *Defendant*, MICHAEL FENKE ET AL., *Appellants*.

312

*Salvador A. Mungia II* (of *Gordon Thomas Honeywell LLP*), for appellants.

*Steven J. Tucker, Prosecuting Attorney,* and *David W. Hubert, Deputy*; and *Stacy A. Bjordahl* (of *Parsons/Burnett/ Bjordahl/Hume LLP*), for respondents.

¶1 SIDDOWAY, A.C.J. — Opponents of a 2009 amendment to Spokane County's comprehensive plan ask us to reverse the superior court and reinstate a decision of the Eastern Washington Growth Management Hearings Board that invalidated the amendment. The growth board concluded that the prospect of future inadequate public facilities presented by the amendment created an immediate inconsistency with the comprehensive plan and declared the amendment invalid. Spokane County had relied on development regulations that would safeguard adequate facilities at the project approval stage.

¶2 Where an amendment to a comprehensive plan is otherwise consistent with plan goals and policies and the local government has protected against a prospect of future inadequate public facilities by enforceable ordinances or regulations requiring concurrency, there is no inconsistency

that violates RCW 36.70A.070. On that basis, and because Spokane County demonstrated the insufficiency of evidence to support other findings of the growth board, we affirm the trial court's reversal of the growth board's final decision and order of invalidity. We reverse its conclusion that the growth board lacked jurisdiction to decide the petition.

## FACTS AND PROCEDURAL BACKGROUND

¶3 Headwaters Development Group LLC and Red Maple Investment Group LLC (hereafter collectively Headwaters) own a five-acre parcel of land in the Wandermere area of Spokane County (County). The parcel is located directly east of the Wandermere shopping center, a short distance south of the Wandermere golf course, and immediately west of an approved subdivision of 330 single family residences known as Stone Horse Bluff. It falls within the urban growth area (UGA) designated by the County. The parcel was zoned low density residential (LDR) before 2009 and designated LDR on the land use map included in the County's comprehensive plan. LDR zoning restricts development to six dwellings per acre.

¶4 In March 2009, Headwaters submitted an application requesting that the County change the parcel's comprehensive plan designation and its zoning classification from LDR to high density residential (HDR) as part of the County's annual comprehensive plan review.[1] Headwaters' purpose in requesting the map amendment was to facilitate its proposed development of a 120-unit, multifamily apartment complex on the parcel.

¶5 The County's planning staff processes public requests for its annual plan amendment by circulating applications

---

[1] The Growth Management Act, chapter 36.70A RCW, requires counties to "establish and broadly disseminate to the public a public participation program" to consider amendments to the comprehensive plan, on an annual basis. RCW 36.70A.130(2)(a). "[A]ll proposals shall be considered by the governing body concurrently so the cumulative effect of the various proposals can be ascertained." RCW 36.70A.130(2)(b).

and environmental checklists required by SEPA[2] to affected agencies and jurisdictions for comment, in anticipation of preparing its own analysis for the benefit of county commissioners. In the case of the Headwaters application, which was denominated 09-CPA-01, county planning staff identified a number of relevant goals and policies of the comprehensive plan that it found were largely served by the map amendment.

¶6 The planning staff described the parcel as a slightly sloped, sparsely treed parcel located west of and adjacent to Dakota Street, approximately one-quarter mile north of its intersection with Hastings Road. It noted that urban level services are typically available in the UGA and that staff received no comments from service providers to indicate that services were not available at the site.

¶7 It reported that property to the west of the parcel was zoned Regional Commercial, was designated as an Urban Activity Center by the comprehensive plan, and was developing as a shopping center. It pointed out that if the zoning and designation of Headwaters' parcel was changed to HDR, it would be developable for a larger variety of housing types and prices, provide affordable housing, permit compact residential development and mixed-use development, and allow for residential uses in business zones—all goals or policies of the urban land use and housing elements of the comprehensive plan.

¶8 Staff noted that the zoning to the north, south, and east was LDR, with single family residences and duplexes to the south and north and the recently approved Stone Horse Bluff residential subdivision to the east. It pointed out that multifamily development of the sort envisioned by Headwaters "is typically viewed as a good transition from high intensity commercial uses to low intensity uses such as single family neighborhoods." Administrative Record (AR) at 501.

---

[2] The State Environmental Policy Act, ch. 43.21C RCW.

¶9 Finally, recognizing that the only existing access to the parcel was Dakota Street—only three-quarters of a mile long, a local access street, and with no sidewalks—and that a 120-unit apartment complex would result in a projected increase of 960 to 1,050 car trips per day, staff pointed out that "[w]hen a specific project is proposed, the County Engineering Department will require the applicant to submit a detailed traffic analysis so that a determination can be made as to what the appropriate mitigation measures may be." AR at 503. It noted that comments had been received back from the County's Division of Engineering and Roads identifying road and traffic-related conditions of approval to be imposed should the amendment be approved by the county commissioners.

¶10 The Division of Engineering and Roads' proposed conditions of approval stated that road construction plans would have to comply with county road standards and cautioned that "mitigation may be required for off-site improvements." AR at 512 (Condition 10). The conditions of approval also stated that

> [t]he Spokane County Engineer will review this project for transportation concurrency requirements at the time of review of a Land Use Application, when the project is defined with a specific use.

*Id.* (Condition 11).

¶11 After the deadline for agency comments on proposed amendments had passed, Headwaters and the County became aware that a significant access that Headwaters assumed would be available in the future from Wandermere Road, the major arterial serving the shopping center to the west, would not be. The Washington Department of Transportation controls access to the road and would not approve access to Headwaters' parcel. That left the Headwaters parcel served by only Dakota Street and any future connections developed into the Stone Horse Bluff subdivision to the east.

¶12 A number of neighboring property owners and residents lodged their opposition to proposed amendment 09--CPA-01. They expressed concern that Headwaters' projected development was incompatible with the low density residential development that had been in the Dakota Street area since the 1970s. They contended that Dakota Street already faced impacts from the Stone Horse Bluff subdivision, with a key impact being on ingress and egress to Hastings Road, which provides access to the county roadway network at Dakota Street's south end.

¶13 Members of the planning commission unanimously recommended denial of proposed amendment 09-CPA-01 "based primarily on traffic issues." AR at 570. In its findings of fact and recommendation, the planning commission expressed its view that, in general, HDR zoning made a good transitional use between the regional commercial uses and single family residential uses adjacent to Headwaters' parcel. But in the case of proposed plan amendment 09-CPA-01, it saw conflicts with "access and compatibility with existing neighborhood character." AR at 573. The planning commission unanimously concluded that the proposed amendment was inconsistent with four comprehensive plan goals or policies (UL.2.16, UL.7, T.2, and T.2.2).

¶14 The planning commission's recommendation was passed on to the County's board of county commissioners, which conducted several public hearings to address the proposals for inclusion in the 2009 amendment to its comprehensive plan. At the conclusion of its hearings, the county commissioners rejected the planning commission's recommendation to deny amendment 09-CPA-01 and instead approved it by a two-to-one vote, finding that

the subject property is adjacent to a commercial land use designation and commercial development to the west and a residential land use designation to the east and residential development to the east and provides a transition buffer

between said land use designations consistent with the Comprehensive Plan Goals and Policies cited in the Division of Building and Planning Staff report.

AR at 12-13 (Finding 10).

¶15 The commissioners' findings of fact and decision noted that amendment 09-CPA-01 was "subject to substantial public testimony i[n] opposition to the proposed amendment due to potential traffic impacts" but found that

> traffic impacts are properly addressed at the project level review consistent with the concurrency provision of Chapter 13.650 of Spokane County Code. Compliance with the concurrency provisions of Spokane County Code may result in a project with less traffic impacts than those allowed by maximum use of the site under the [HDR] zone and traffic mitigation measures will be commensurate with actual development.

*Id.*

¶16 Neighbors and property owners opposed to amendment 09-CPA-01 filed a petition for review with the Eastern Washington Growth Management Hearings Board 60 days later, serving copies of the petition on the County's prosecuting attorney and on the lawyer who had represented Headwaters before the county commissioners. They did not serve a copy on the county auditor. Headwaters was granted leave to intervene in the growth board proceeding, and it and the County promptly moved to dismiss the proceeding based on the petitioners' failure to timely serve the county auditor. The growth board denied the motion, holding that while service on the auditor was required by its rules, the requirement was not statutory or jurisdictional. It found substantial compliance and no prejudice to the County.

¶17 Following a hearing on the merits, the growth board concluded that amendment 09-CPA-01 was not in compliance with the Growth Management Act (GMA), chapter 36.70A RCW, because it created an internal inconsistency within the comprehensive plan in violation of RCW 36.70A.070. In particular, it found inconsistencies between

the map amendment and the same comprehensive plan goals and policies that the planning commission had identified in recommending denial. It also concluded that when adopting a map amendment, the GMA requires the County to engage in a contemporaneous review of its capital facilities and transportation plans and amend them to address the timing and financing for constructing additional facilities.

¶18 The County and Headwaters appealed the growth board's final decision and its earlier denial of their motion to dismiss to the Spokane County Superior Court, which reversed both decisions. A dozen of the neighbors and property owners who originally petitioned the growth board joined in this appeal. They refer to their united position as "Masinter's" (evidently referring to petitioner David Masinter, since they describe the united position, for convenience, as "his"), which is how we will refer to their position as well.

## ANALYSIS

¶19 Like so many appeals of local government planning decisions that are reversed by the growth board, this case requires us to harmonize competing powers delegated to that board and to local governments by the GMA. *See Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 228, 231, 110 P.3d 1132 (2005) (discussing conflict between "competing powers"). In doing so, we apply a unique standard of review that requires that the growth board defer to the decisions of local governments on matters governed by the GMA, except where the local government has clearly erred.

¶20 First, however, we address the County's[3] threshold argument that the growth board should have dismissed the petition for review at the outset for failure to serve the

---

[3] In discussing the respondents' positions, we refer to the County and Headwaters collectively as "the County" for convenience, in light of their joint briefing on appeal.

county auditor as required by former WAC 242-02-230 (2009), *repealed by* Wash. St. Reg. 11-13-111 (July 22, 2011).

I

¶21 Masinter concedes that he did not serve a copy of his petition for review on the Spokane County auditor, as required by the growth board's regulations. The GMA itself does not impose service requirements on a party challenging whether a county's amendment to its comprehensive plan complies with the act. It imposes a filing deadline, located at RCW 36.70A.290. It otherwise provides that proceedings before the growth board "shall be conducted in accordance with such administrative rules of practice and procedure as the [growth] board prescribes." RCW 36.70A.270(7).[4]

¶22 Former WAC 242-02-230 provides that

(1) . . . A copy of the petition for review shall be personally served upon all other named parties or deposited in the mail and postmarked on or before the date filed with the board. When a county is a party, the county auditor shall be served in noncharter counties.[5]

The parties do not dispute that the regulation applied to Masinter. Elsewhere, the same regulation provides:

(2) A board may dismiss a case for failure to substantially comply with subsection (1) of this section.

Former WAC 242-02-230.

¶23 Masinter argues that the growth board's denial of Headwaters' and the County's motion to dismiss can be

---

[4] We quote the current statute; there was no change in substance with the Laws of 2010, ch. 211, § 6 amendment.

[5] At times relevant to this proceeding, the growth board's rules of practice and procedure appeared in chapter 242-02 of the Washington Administrative Code. They now appear in chapter 242-03 WAC. With the repeal of chapter 242-02 and the adoption of chapter 242-03 as its replacement, this section has been recodified as WAC 242-03-230(2)(b) and (4), respectively. The language has not substantially changed.

upheld on the basis that the decision to dismiss a petition is expressly discretionary. Alternatively, he argues that he substantially complied with the service requirement of the rule by serving both the county prosecutor and the lawyer for the intervenors.

■ ■ ¶24 "Rules of statutory construction apply to administrative rules and regulations, particularly where . . . they are adopted pursuant to express legislative authority." *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979); *see also Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 51-52, 239 P.3d 1095 (2010). If the meaning of the rule is plain and unambiguous on its face, this court must give effect to that plain meaning. *Overlake Hosp.*, 170 Wn.2d at 52. Only if more than one reasonable interpretation of the regulation exists is there an ambiguity, in which case the court may resort to statutory construction, legislative history, and case law to resolve the ambiguity. *Id.*; *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 57, 50 P.3d 627 (2002).

■ ■ ¶25 Here, the meaning of the rule is clear. Former WAC 242-02-230(1) clearly requires that the county auditor "shall" be served with a copy of the petition. But former WAC 242-02-230(2) just as clearly provides that the consequence of a failure to substantially comply is that the growth board "may" dismiss the case. The sequence of all statutes (or in this case, regulations) relating to the same subject matter should be considered in ascertaining legislative intent. *Clark v. Pacificorp*, 118 Wn.2d 167, 176, 822 P.2d 162 (1991) (construing notice requirements of Industrial Insurance Act, Title 51 RCW). When a provision contains both "shall" and "may," it is presumed that "shall" was intended to be mandatory and "may" was intended to be permissive. *Id.* at 176-77 (citing *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435, 656 P.2d 1083 (1982)); *and see Pierce v. Yakima County*, 161 Wn. App. 791, 800-01, 251 P.3d 270, *review denied*, 172 Wn.2d 1017 (2011).

■ ¶26 Where a statute—or in this case, a regulation—says that a matter "may" be dismissed for failure to sub-

stantially comply with the service requirement, we review a decision to dismiss for abuse of discretion. *Cf. Cummings v. Budget Tank Removal & Envtl. Servs., LLC*, 163 Wn. App. 379, 385, 260 P.3d 220 (2011) (standard of review where statute provided that court "may" order consolidation). The County has not argued that the growth board abused its discretion.

¶27 Because the regulation makes dismissal discretionary and the County presents no argument that discretion was abused, we need not reach the parties' dispute over whether Masinter substantially complied with the service requirements. The superior court erred in concluding that Masinter's petition should have been dismissed on jurisdictional grounds.

## II

¶28 We turn, then, to the merits.

### A. Standard of Review

¶29 The legislature's stated intent in enacting the GMA was to combat "uncoordinated and unplanned growth" in the state and "a lack of common goals expressing the public's interest in the conservation and the wise use of our lands." RCW 36.70A.010. The act "requires local planning to take place within a framework of state goals and requirements." RCW 36.70A.3201. Growth management boards adjudicate issues of GMA compliance and may invalidate noncompliant comprehensive plans. RCW 36.70A.280(1)(a), .302.

¶30 While the legislature has dictated the framework in the GMA, the act nonetheless "contains numerous provisions which tend to show that local jurisdictions have broad discretion in adapting the requirements of the GMA to local realities." *Quadrant Corp.*, 154 Wn.2d at 236. They include imposing a presumption that comprehensive plans and development regulations are valid upon adoption, re-

quiring a challenger of county action under the GMA to carry the burden of demonstrating that the action is not in compliance with the act, and requiring that the growth board broadly defer to local planning determinations and find compliance with the GMA unless it determines that an action is " 'clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [chapter 36.70A RCW].' " *Id.* at 237 (quoting RCW 36.70A.320(3)); RCW 36.70A.320(1)-(2). "To find an action 'clearly erroneous,' the [growth] Board must have a 'firm and definite conviction that a mistake has been committed.' " *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 497, 139 P.3d 1096 (2006) (quoting *Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994)). "[T]he ultimate burden and responsibility for planning, harmonizing the planning goals of the chapter, and implementing a county's or city's future rests with that community." RCW 36.70A.3201.

¶31 We review growth board decisions under the Administrative Procedure Act (APA), chapter 34.05 RCW, which places the burden of demonstrating the invalidity of agency action on the party asserting invalidity—here, the County. RCW 34.05.570(1)(a); *see also Feil v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 367, 376, 259 P.3d 227 (2011). On appeal, "[w]e review the [growth] Board's decision from the same vantage point as the trial court, applying [APA] standards directly to the record before the Board." *Manke Lumber Co. v. Diehl*, 91 Wn. App. 793, 801-02, 959 P.2d 1173 (1998) (footnote omitted). We disregard findings of fact and conclusions of law entered by the superior court. *Humbert v. Walla Walla County*, 145 Wn. App. 185, 192 n.3, 185 P.3d 660 (2008). We will grant relief from a growth board order only if we determine that the order suffers from one or more of the infirmities identified in RCW 34.05.570(3). *Lewis County*, 157 Wn.2d at 498.

¶32 The County claims that reversal of the growth board's decision is warranted on the following bases for relief provided by the APA:

> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ; [or]
>
> . . . .
>
> (i) The order is arbitrary or capricious.

RCW 34.05.570(3). We review errors of law alleged under RCW 34.05.570(3)(d) de novo; review a challenge under RCW 34.05.570(3)(e) that an order is not supported by substantial evidence by determining "whether there is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order' "; and review a challenge under RCW 34.05.570(3)(i) that an order is arbitrary and capricious by determining "whether the order represents 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.' " *Kittitas County v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011) (internal quotation marks omitted) (quoting *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008); *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46-47, 959 P.2d 1091 (1998)).

¶33 Finally, "deference to county planning actions, that are consistent with the goals and requirements of the GMA, supersedes deference granted by the APA and courts to administrative bodies in general." *Quadrant Corp.*, 154 Wn.2d at 238. Accordingly, "a [growth] board's ruling that fails to apply this 'more deferential standard of review' to a county's action is not entitled to deference [on appeal]." *Id.*

## B. The County's Right to Relief under the APA

¶34 The County argues that it is entitled to relief from the growth board's decision because the challenged land use amendment is consistent—not inconsistent—with its comprehensive plan. It argues that the growth board erroneously concluded otherwise, in part, because it failed to respect the County's choice to ensure that goals and policies to locate growth where public facilities are adequate are met by requiring developers to demonstrate concurrency or mitigate at the project approval stage.

¶35 We first review the County's planning approach and then address whether adoption of amendment 09-CPA-01 was consistent with its comprehensive plan.

### 1. The County's Planning Approach

¶36 The County was required by the GMA to adopt a comprehensive plan and did so in 2001. A "comprehensive plan" is the "generalized coordinated land use policy statement of the governing body of a county." RCW 36.70A-.030(4). In enacting the GMA, the legislature identified 13 planning goals "to guide the development and adoption of comprehensive plans and development regulations." RCW 36.70A.020. Among the legislatively identified goals are planning for adequate public facilities and services. RCW 36.70A.020(12).

¶37 Mandatory elements of a comprehensive plan include "a map or maps, and descriptive text covering objectives, principles, and standards used to develop the comprehensive plan." RCW 36.70A.070. The comprehensive plan is required to include a plan, scheme, or design for nine elements, including—relevant here—a land use element, a capital facilities plan element, and a transportation element. RCW 36.70A.070(1)-(9). The transportation element must implement, and be consistent with, the land use element.

¶38 Consistency is generally required of the plan:

The plan shall be an internally consistent document and all elements shall be consistent with the future land use map.

RCW 36.70A.070. The growth board's regulations interpret this internal consistency requirement to mean that "differing parts of the comprehensive plan must fit together so that no one feature precludes the achievement of any other." WAC 365-196-500(1).

¶39 After adopting its comprehensive plan, the County adopted a number of development regulations. It adopted a concurrency ordinance, appearing in chapter 13.650 Spokane County Code (SCC). The ordinance is not solely the County's invention; the GMA requires local jurisdictions to adopt ordinances "which prohibit development approval if the development causes the level of service on a locally owned transportation facility to decline below the standards adopted in the transportation element of the comprehensive plan, unless transportation improvements or strategies to accommodate the impacts of development are made concurrent with the development." RCW 36.70A.070(6)(b). Strategies may include increased public transportation service, ride sharing programs, demand management, and other transportation systems management strategies. *Id.* A requirement that transportation improvements or strategies to accommodate development be "concurrent with the development" means "that improvements or strategies are in place at the time of development, or that a financial commitment is in place to complete the improvements or strategies within six years." *Id.*

¶40 The chapter of the SCC dealing with concurrency identifies many development applications that are subject to transportation concurrency review. Among them are applications for short plats and residential building permits over four units, both of which will be required for Headwaters' anticipated development. SCC 13.650.104(a)(2), (6). A certificate of concurrency from the division of engineering

is required before such applications and permits can be approved. SCC 13.650.104. If a proposed project fails the concurrency test and the project permit cannot be conditioned to accomplish concurrency, the project permit "shall" be denied. SCC 13.650.106(b)(6).

¶41 In addition to the concurrency ordinance, the County has adopted a capital facilities plan element within its comprehensive plan, as well as a freestanding capital facilities plan. Like the concurrency ordinance, the "overall goal" of the County's capital facilities plan "is to make certain new development does not exceed the County's ability to pay for needed facilities and that new development does not decrease current service levels below locally established adopted minimum standards." SPOKANE COUNTY CAPITAL FACILITIES PLAN Introduction at I-1 (Jan. 16, 2007), *available at* http://www.spokanecounty.org/BP/data/Documents/CapFac/TOC.pdf. The capital facilities plan is concerned with "prepar[ing] sound fiscal policies to provide adequate public facilities consistent with the Comprehensive Plan and concurrent with, or prior to, the impacts of development." SPOKANE COUNTY COMPREHENSIVE PLAN ch. 7—Capital Facilities and Utilities at CF-2 (Nov. 5, 2001, as amended through Apr. 10, 2007), *available at* http://www.spokanecounty.org/BP/data/Documents/CompPlan/TOC.pdf (COMPREHENSIVE PLAN).[6] The County's capital facilities plan includes an inventory of existing capital facilities,[7] a forecast of future needs, the proposed locations and capacities of new or expanded facilities, and a financing plan.

¶42 The capital facilities plan recognizes that urban services and facilities will be provided by private developers concurrent with development in some circumstances. *See*

---

[6] The County's convention for numbering goals, policies, and pages of the plan uses CF for Capital Facilities and Utilities, UL for Urban Land Use, and T for Transportation.

[7] Capital facilities include "roads, water and sewer systems, parks, jails and solid waste. Capital Facilities are provided by both public and private entities." COMPREHENSIVE PLAN at CF-1.

*id.* at CF-7 (Policy CF.3.3). Addressing impact fees to be imposed on development,[8] it provides that "[g]rowth and development activity should pay a proportionate share of the cost of planned facilities needed to serve the growth and development activity," including public streets and roads. *Id.* at CF-15 (Goal CF.17 (boldface omitted), Policy CF.17.1).

¶43 Finally, the County adopted road standards that impose the burden on a developer to finance and construct roadway improvements conforming to then-current requirements for the functioning classification of the road, providing, in relevant part, that

> [a]ll . . . multi-family residential property development . . . plans shall have the general obligation to bring any substandard and abutting County right(s)-of-way and County road(s) up to the current requirements of the arterial road plan and functioning classification of the road, respectively. Required roadway improvements must be completed prior to finalization of any non-residential binding site plan, short plat, or plat unless otherwise allowed by the County Engineer or their authorized agent. Additional road improvements or mitigation measures may also be required pursuant to the findings of the accepted traffic study or analysis required for that proposal.

SPOKANE COUNTY ENG'RS, SPOKANE COUNTY ROAD STANDARDS § 1.31, at 1-11 (Jan. 2010), *available at* http://www.spokane

---

[8] RCW 82.02.050-.090, which were enacted as part of the GMA, authorizes local governments to condition the approval of development proposals on the payment of "impact fees" to share the costs arising from "new growth and development." RCW 82.02.050(1)(a); *City of Olympia v. Drebick*, 156 Wn.2d 289, 296, 126 P.3d 802 (2006). "[B]y enacting the impact fee statutes, the legislature intended to enable towns, cities, and counties to plan for 'new growth and development' and to recoup from developers a predictable share of the infrastructure costs attributable to the planned growth, with the qualification that the local government's 'procedures and criteria' were to protect 'specific developments' from impact fees that were 'arbitrary' or that 'duplicat[ed]' the amount paid for 'the same impact.'" *Drebick*, 156 Wn.2d at 296 (second alteration in original). The fees are imposed on "development activity." RCW 82.02.050(2). RCW 82.02.050 authorizes local governments, planning under the GMA, to impose impact fees on individual developments to cover the increased demand for roads identified in the capital facilities plan for a designated service area. *Drebick*, 156 Wn.2d at 297.

county.org/data/buildingandplanning/annexandincorp/gran
ts/AppendixA2.pdf (ROAD STANDARDS).

¶44 The County's comprehensive plan and development
regulations have been deemed compliant with the GMA and
are not collaterally attacked in this proceeding.

 2. Has the County Demonstrated That the Growth
 Board's Findings Are Unsupported by Substantial
 Evidence or Misinterpret or Misapply the GMA?

 ¶45 Amendments to a comprehensive plan must
conform to the GMA. RCW 36.70A.130(1)(d). Growth boards
have jurisdiction to review petitions challenging whether a
plan amendment or revision complies. *Spokane County v. E.
Wash. Growth Mgmt. Hearings Bd.*, 160 Wn. App. 274,
281-82, 250 P.3d 1050, *review denied*, 171 Wn.2d 1034 (2011).
In determining that part of a comprehensive plan is invalid,
the growth board is required to specify in its final order "the
particular part . . . of the plan . . . determined to be invalid,
and the reasons for [its] invalidity." RCW 36.70A.302(1)(c).

¶46 The growth board's final decision and order identi-
fied the reasons for the invalidity of amendment 09-CPA-01
as being that it

> is inconsistent with the goals and policies of the Comprehen-
> sive Plan, including goals and policies UL.2.16, UL.7, T.2, and
> T.2.2, the Capital Facilities Element, and the Transportation
> Element. Therefore, the land use map amendment created an
> internal inconsistency within the Comprehensive Plan in vio-
> lation of RCW 36.70A.070.

AR at 755. To assess the County's challenge, we review the
commissioners' findings and the matters they considered in
approving amendment 09-CPA-01 against the bases for
invalidation identified by the growth board.

¶47 The growth board invalidated amendment 09-
-CPA-01 based on the following asserted inconsistencies
with the County's comprehensive plan.

## Policy UL.2.16

¶48 The County's policy UL.2.16, part of the "urban character and design" section and included in the policies' discussion of "multifamily residential," provides:

UL.2.16 Encourage the location of medium and high density residential categories near commercial areas and public open spaces and on sites with good access to major arterials.

COMPREHENSIVE PLAN ch. 2—Urban Land Use at UL-6. In finding consistency with this policy, staff pointed out that Headwaters' parcel is located immediately adjacent to the Wandermere shopping center and other surrounding commercial development.

¶49 Masinter argues, however, that "[t]he proposed high density designation does not have good access to major arterials; instead, it has access to a narrow, residential road." Br. of Appellant at 18-19. It is true that the parcel's only existing access is to Dakota Street, beginning one-quarter mile from Hastings Road. But the County responds that via Dakota Street, the parcel is connected to the county roadway system by Hastings Road, with access to Hawthorne Road, a major arterial. It also points out that Dakota Street is projected to be connected to roads that will be constructed in the Stone Horse Bluff subdivision east of the property, although there is no suggestion that those connections will improve its access to a major arterial.

¶50 The County also argues that the growth board was presented with no expert testimony that Dakota Street *could not* support the increased traffic projected from even a 120-unit development on the parcel. Headwaters submitted a letter from a road and traffic planner, who concluded that Dakota Street has the functional capacity needed to accommodate another 1,050 trips a day, which he calculated as the impact of Headwaters' anticipated development. The planner described his evaluation of roadway capacity as

"cursory" but asserted that the County's arterial map, the County's geographic information systems, and his own knowledge of the County's functional classification and capacity guidelines was sufficient for him to perform the assessment. AR at 689.

¶51 It is significant that the policy speaks of "encouraging" the location of medium and high density residential categories based on the three characteristics or proximities that it identifies as desirable. The comprehensive plan contains dozens of planning goals and policies. It is unlikely that any map amendment would advance all of them.

¶52 In identifying 13 goals to guide local comprehensive planning, the legislature itself cautioned that it was not listing goals in order of priority and that its identification of the goals "shall be used exclusively for the purpose of guiding the development of comprehensive plans and development regulations." RCW 36.70A.020. Goals considered by local governments in comprehensive planning may be mutually competitive at times. *Quadrant Corp.*, 154 Wn.2d at 246 (quoting Richard L. Settle, *Washington's Growth Management Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 11 (1999)). For that reason, if a map amendment meaningfully advances other comprehensive plan goals and policies, a finding by the growth board that it fails to advance another—if it fails to advance, for example, a goal of encouraging high density residential development on sites having good access to a major arterial—that alone cannot be an invalidating inconsistency. The weighing of competing goals and policies is a fundamental planning responsibility of the local government.

## Goal UL.7

¶53 The growth board next invalidated amendment 09--CPA-01, in part, on the basis of the County's goal UL.7, part of the "residential land use" section, which provides:

UL.7 Guide efficient development patterns by locating residential development in areas where facilities and ser-

vices can be provided in a cost-effective and timely fashion.

COMPREHENSIVE PLAN at UL-11 (boldface omitted).

¶54 Staff commented on this goal, pointing out to the county commissioners that the "site is located within an Urban Growth Area where municipal services are available." AR at 502. On appeal, the County adds that amendment 09-CPA-01 advances several residential land use policies adopted under this goal. High density residential development is typically more affordably priced. That, and the parcel's location immediately adjacent to the Wandermere shopping center with a concentration of other commercial developments in the near vicinity, advances residential land use policies to "[c]oordinate housing and economic development strategies to ensure that sufficient land is provided for affordable housing in locations readily accessible to employment centers," according to the County. COMPREHENSIVE PLAN at UL-11 (Policy UL.7.2). The County also argues that because the parcel lies within the UGA, the designation change to HDR promotes infill development, consistent with residential land use policies UL.7.3, UL.7.4, and UL.7.5.

¶55 Neither the growth board nor Masinter specify any inconsistency between goal UL.7 and amendment 09-CPA--01. We presume that both had in mind the claimed inadequacy of Dakota Street to accommodate HDR development on the parcel. Clearly, though, the County has identified policies of the residential land use goal that are advanced by the map amendment.

### Goal T.2 and Policy T.2.2

¶56 The growth board next invalidated amendment 09-CPA-01 on the basis, in part, of transportation goal T.2 and policy T.2.2. The goal and policy, both of which are included in a section on "consistency and concurrency," provide:

T.2 Provide transportation system improvements concurrent with new development and consistent with adopted land use and transportation plans.

 . . . .

 T.2.2 Transportation improvements needed to serve new developments shall be in place at the time new development impacts occur. If this is not feasible, then a financial commitment, consistent with the capital facilities plan, shall be made to complete the improvement within six years.

COMPREHENSIVE PLAN ch. 5—Transportation at T-6 through T-7 (boldface omitted).

¶57 County staff commented on the transportation goals and policies in its report to the commissioners and, with respect to goal T.2 and policy T.2.2, concluded:

When a specific project is proposed, the County Engineering Department will require the applicant to submit a detailed traffic analysis so that a determination can be made as to what the appropriate mitigation measures might be.

AR at 503.

¶58 The County's defense of this conclusion presents the principal point of contention in this appeal. The County argues that there is no inconsistency between the map amendment and the transportation goal and policies because the amendment is not a development proposal. When a development proposal is submitted, it argues, then the development regulations implemented by policy T.2.2 and required by RCW 36.70A.070(6)(b) will govern conditions imposed upon the approval or denial of the proposal. They will ensure that the goal and the policy are met. As a result, there is no inconsistency.

¶59 The growth board called out the County's position on this score for special criticism. It noted:

Spokane County and Intervenors argue that traffic impacts will be subsequently reviewed and mitigated during the site-

specific land use approval process and will be required to meet traffic concurrency at that later point in time. That is all that the GMA requires, according to the County and Intervenors.

AR at 750-51. Rejecting the County's position, the growth board reasoned:

> In order to have adequate public facilities at the time the development is available for occupancy and use, capital facilities planning must be done well before the start of on-the-ground development activities. Advance planning identifies transportation improvements or strategies that must be made concurrent with the development to prevent levels of service from declining below standards. The GMA requires counties to forecast capital facilities needs at least six years into the future with a plan that will finance capital facilities within projected funding capacities and clearly identifies sources of public money for such purposes. Moreover, Counties must reassess the land use element if probable funding falls short of meeting existing needs. *All proposed amendments to the future land use map must be evaluated for consistency with the capital facilities element and multi-year transportation financing plan.*
>
> *By its very nature, capital facilities planning must be done at the PLAN approval stage as opposed to the PROJECT approval stage in order to effectively provide for the necessary lead time and identification of probable funding sources, and also to inform decision makers and the public as they consider the public infrastructure impacts of proposed comprehensive plan amendments.* While specific project details will not necessarily be known at the Plan approval stage, some overall forecasting can be done based on reasonable planning assumptions and current development regulations. Advance planning identifies the public facility needs which then become inputs to the multiyear financing plan required by RCW 36.70A.070(3) and .070(6). Thus, *capital facility funding and scheduling issues need to be evaluated at the time the future land use map is amended.* The cumulative effects must also be considered, and map amendments must conform to all other GMA standards and requirements.

AR at 751-52 (emphasis added) (boldface and footnotes omitted).

¶60 We find no basis in the GMA for the conclusions of the growth board highlighted above and what can fairly be characterized as the board's rule of decision: that to avoid inconsistency, capital facility funding and scheduling issues must be evaluated and the results incorporated into the transportation and capital facilities elements of the comprehensive plan every time the comprehensive plan map is amended. Here, we address three separately stated but related rationales for the growth board's invalidation of the map amendment: (1) the map's asserted inconsistency with goal T.2 and policy T.2.2, (2) the conclusion that the County violated RCW 36.70A.020(12) by failing to consider the adequacy of public facilities at the map amendment stage, and (3) the failure of the County's capital facilities and transportation plans to consider the map amendment.

¶61 To begin with, neither the growth board nor Masinter identifies a provision of the GMA that supports the rule of decision. The presumption of validity and compliance that the growth board owes the commissioners' amendment can be overcome only by demonstrating that the County's action was a clearly erroneous application of a specific requirement of the GMA. RCW 36.70A.320; *Quadrant Corp.*, 154 Wn.2d at 240; *Manke Lumber Co. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 113 Wn. App. 615, 624, 53 P.3d 1011 (2002). Because the GMA was " ' "spawned by controversy, not consensus," ' " it is not to be liberally construed. *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 342, 190 P.3d 38 (2008) (quoting *Woods v. Kittitas County*, 162 Wn.2d 597, 612 n.8, 174 P.3d 25 (2007) (quoting Settle, *supra*, at 34)).

¶62 Nor can the growth board's conclusion be supported as finding clear error based not on an individual provision of the GMA, but "in light of the goals and requirements of chapter 36.70A RCW." In fact, a number of GMA provisions cut against the growth board's conclusion that a map amendment requires contemporaneous amendment of other elements of the comprehensive plan—or, stated differently, map amendment concurrency.

¶63 First, RCW 36.70A.070(6)(c) provides that the transportation element of a comprehensive plan must be consistent with six-year plans required by statute of cities, counties, and public transportation systems and the investment program required of the state. By implication, the transportation element is not required to be reevaluated and amended for every intervening amendment of the land use map—in this case, a site-specific amendment changing the designation of a 5-acre parcel, in a county whose land area exceeds 1,750 square miles.[9]

¶64 Second, the requirement of RCW 36.70A.070(6)(b) that jurisdictions adopt and enforce concurrency ordinances provides that such ordinances must

> prohibit *development approval* if the development causes the level of service on a locally owned transportation facility to decline below the standards adopted in the transportation element of the comprehensive plan, unless transportation improvements or strategies to accommodate the impacts of development are made *concurrent with the development*.

(Emphasis added.) In requiring development-stage concurrency, the statute contemplates that projects may reach the development stage having land use designations, zoning, and projected traffic impacts for which existing public facilities are inadequate.

¶65 Third, RCW 36.70A.070(3) requires a capital facilities plan element that includes at least a six-year financing plan. It includes no requirement that the six-year financing plan be reevaluated and amended for intervening amendments to a land use plan.

¶66 Fourth, RCW 36.70A.130 generally provides for the review procedures and schedules for review and amendment of comprehensive plans, and includes the requirement of a public participation program by which members of the

---

[9] Judicially noted from *State & County QuickFacts: Spokane County, Washington*, U.S. Census Bureau, http://quickfacts.census.gov/qfd/states/53/53063.html (Jan. 10, 2013, 3:20 PM).

public may propose amendments to the land use map, as Headwaters did here. RCW 36.70A.130(2)(a). In providing for annual amendment of the comprehensive plan, the statute imposes no requirement that there be contemporaneous reevaluation of the local government's capital facilities plan or transportation plan.

¶67 Finally, provisions of the GMA dealing with local project review cut against the growth board's conclusion that any amendment to the land use plan requires contemporaneous reevaluation and amendment of the capital facilities and transportation elements and plans. They contemplate meaningful action at the project approval stage to ensure conformity to the comprehensive plan. RCW 36.70B.030(1) provides that the "foundation" for project review is the "[f]undamental land use planning choices made in adopted comprehensive plans and development regulations." RCW 36.70B.040(1)(c) provides that a proposed project's "consistency" with a local government's development regulations (or, in their absence, the elements of its comprehensive plan) "shall be decided by the local government during *project review*" by consideration of, among other factors, the type of land use, density, and "[i]nfrastructure, including public facilities and services needed to serve the development." (Emphasis added.)

¶68 The growth board's analysis of what *must* be done at the planning stage, given the "very nature" of planning, does not persuade us that the County has violated the GMA. The growth board may be correct that evaluation of the funding and scheduling of infrastructure improvements at that early point will provide "lead time" to "identify probable funding sources." But there are countervailing disadvantages. That early evaluation point is, in significant respects, premature. As the County argues, until a specific project is submitted for review and approval, the County will not know the project-specific impacts, what mitigation it might require, and how the process and results of concurrency review might cause the applicant to make

changes to its project. And for a County like Spokane that has made the choice to rely to the extent possible on developer financial responsibility for improvements and impact fees, identifying probable funding sources at the earliest possible time need not be a compelling concern.

¶69 True, the County's approach is more likely to result in project delay or required modification at the development stage because of a concurrency violation. But as long as financing and concurrency obligations have been adopted and are enforced—and Masinter did not explain in his brief or when questioned at oral argument why they would not be enforced—there is no inconsistency. *Cf. Brinnon Grp. v. Jefferson County*, 159 Wn. App. 446, 477, 245 P.3d 789 (2011) (amendment of land use designations map without contemporaneously amending corresponding map in subarea plan did not create internally inconsistent document; board of county commissioners explicitly provided for a multiphase process in which consistency was assured in a later phase).

¶70 Where consistency is assured in this way, the timing of a local government's consideration of financing for facilities is the sort of development regulation judgment that the GMA contemplates being made locally. In such cases, concurrency at the map amendment stage is not required by the GMA.

## Policy UL.2.20

¶71 The growth board did not identify inconsistency with the County's policy UL.2.20 as a basis for invalidating amendment 09-CPA-01 in stating its conclusions. It did address the policy in the body of its decision. Masinter relies upon the policy as an additional basis for inconsistency on appeal. We will assume that the growth board intended to rely on it as well.

¶72 The policy, part of the "urban character and design" section and included in the policy's discussion of "traffic patterns and parking," states:

UL 2.20 Encourage new developments, including multifamily projects, to be arranged in a pattern of connecting streets and blocks to allow people to get around easily by foot, bicycle, bus or car.

COMPREHENSIVE PLAN at UL-7.

¶73 Here again, because there was only a map amendment, the County had no project proposal identifying how ingress and egress to the apartment complex will be designed.

¶74 Masinter argues that Dakota Street is a dead-end street. It was, at the time of the hearing. Plans for the Stone Horse Bluff subdivision to the east are projected to introduce some connectivity because roads planned for the subdivision will intersect with Dakota Street.

¶75 In any event, Dakota Street, being a dead-end street, presently fails connectivity. Without access to Wandermere Road—and there is no suggestion that Headwaters did not try to secure that access—Headwaters is unable to introduce connecting streets or blocks to the Dakota Street area. That will be true whether it develops 30 single family homes or 120 apartment units.

¶76 The growth board's decision concludes there was no evidence the County considered any arrangements "to allow people to get around easily by foot, bicycle, bus, or car," as the policy says should be "encouraged." It does not explain how or why the map amendment under consideration would have addressed such arrangements. County development regulations contemplate that such matters will be addressed at the project approval stage. The County's road standards require, as a condition to development approval, that roads be provided or improved to meet county standards; that adequate pedestrian access be provided; that pedestrian-vehicular conflicts be minimized; that any substandard and abutting county rights-of-way and county roads be brought up to current requirements of the arterial road plan and functioning classification of the road; and, in

the case of parcels located within the UGA, that project design adhere to urban connectivity design standards. ROAD STANDARDS §§ 1.03, 1.31, 1.32, at 1-5 through 1-6, 1-11 through 1-13.

¶77 Because the County was not required to address the policy at the map amendment stage, there was no basis for the growth board to find an invalidating inconsistency.

¶78 To conclude, we agree with the County that the growth board misinterpreted the GMA when it concluded that to avoid inconsistency, the County was required to evaluate capital facility funding and scheduling issues and incorporate the results into the transportation and capital facilities elements of the comprehensive plan at the time it adopted 09-CPA-01. Given the County's development regulations requiring concurrency at the project approval stage, the map amendment did not preclude achievement of other features of the comprehensive plan. It was therefore consistent within the meaning of RCW 36.70A.070(6)(b). *See* WAC 365-196-500(1). While Masinter argues that we should defer to the growth board's construction of the consistency requirement, " 'it is ultimately for the court to determine the purpose and meaning of statutes, even when the court's interpretation is contrary to that of the agency charged with carrying out the law.' " *City of Redmond*, 136 Wn.2d at 46 (quoting *Overton v. Econ. Assistance Auth.*, 96 Wn.2d 552, 555, 637 P.2d 652 (1981)).

¶79 The growth board's findings that the map amendment was inconsistent with UL.2.16, UL.2.20, UL.7, T.2, and T.2.2 were not supported by substantial evidence. The record before the county commissioners established that the map amendment advanced a number of plan policies and goals. Any policies or goals that it failed to advance were hortatory, not mandatory. The responsibility to weigh competing goals and policies was that of the county commissioners.

¶80 We reverse the trial court's judgment insofar as it reversed the growth board's order denying the motion to

dismiss. We affirm its judgment reversing the growth board's final decision and order of invalidity.

SWEENEY and BROWN, JJ., concur.