**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

September 27, 2022

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| HOMEWARD BOUND IN PUYALLUP, | No. 55560-3-II |
| Appellant, | |
| v. | |
| CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD; and CITY OF PUYALLUP, | PUBLISHED OPINION |
| Respondents. | |

GLASGOW, C.J.—In 2018, the city of Puyallup adopted Puyallup Municipal Ordinance (PMO) 3179, which established a new chapter of the Puyallup Municipal Code—chapter 20.72 (PMC 20.72). This new code chapter restricted the siting of day use centers and overnight shelters serving people experiencing homelessness within the City. The ordinance permitted such centers and shelters only in industrial zones in a small corner of the City that was distant from any services and had almost no access to transit. Siting anywhere else in the City required approval from a majority of Puyallup's city council.

Homeward Bound in Puyallup, which already operated one drop-in center, petitioned for review of the ordinance. Homeward Bound argued that PMC 20.72 was inconsistent with multiple policies in Puyallup's comprehensive growth management plan and violated several provisions of the Growth Management Act (GMA), chapter 36.70A RCW. In part, Homeward Bound asserted that PMC 20.72 violated the GMA's prohibition on development regulations that preclude the siting of essential public facilities.

No. 55560-3-II

The Central Puget Sound Growth Management Hearings Board ruled that the GMA did not require day use centers and overnight shelters serving people experiencing homelessness to be identified as essential public facilities under the GMA as a matter of law but that the City had discretion to do so. The Board ruled that PMC 20.72 did not substantially interfere with any GMA goal. But the Board ruled that PMC 20.72 was inconsistent with several comprehensive plan policies, and the City had to come into compliance with the plan.

In response, the City adopted a second ordinance, PMO 3195, to amend PMC 20.72, expanding the zoning districts where day use centers and overnight shelters could be sited to include areas with improved transit access. The Board then found the amended version of PMC 20.72 complied with the comprehensive plan.

Homeward Bound appeals both Board decisions. It argues that the Board erred in ruling that centers and shelters serving people experiencing homelessness are not essential public facilities under the GMA. It contends that PMC 20.72 improperly precludes the siting of such facilities. Homeward Bound also asserts the Board should have concluded that even after the amendments in PMO 3195, PMC 20.72 remained inconsistent with the comprehensive plan.

We affirm both of the Board's orders. We hold that the Board did not have authority to rule that centers and shelters serving people experiencing homelessness constitute essential public facilities as a matter of law when the facilities were not expressly included in the GMA's statutory list. But the City could conclude that such centers and shelters are essential public facilities after applying a process for identifying additional essential public facilities not expressly named in the GMA's statutory list. We also hold that the Board had no obligation to define "centers and shelters" as essential public facilities under the City's comprehensive plan when Homeward Bound argued

2

No. 55560-3-II

solely under the statutory definition. And even if such centers and shelters constitute essential public facilities, PMC 20.72 does not preclude their siting. We further agree with the Board that the amendments to the municipal code adopted in PMO 3195 brought the municipal code into compliance with the comprehensive plan.

FACTS

Twenty-nine counties, including Pierce County, currently plan under the GMA, which means that the cities within those counties must also comply with the GMA. RCW 36.70A.040(2)(a). Among other requirements, any city planning under the GMA must "adopt a comprehensive plan under this chapter" as well as "development regulations that are consistent with and implement the comprehensive plan." RCW 36.70A.040(3)(d).

Under the GMA, counties and cities must include a process "for identifying and siting essential public facilities" in their comprehensive plans. RCW 36.70A.200(1)(a). And the GMA prohibits comprehensive plans and development regulations like the PMC from precluding the siting of essential public facilities. RCW 36.70A.200(5).

> Essential public facilities include those facilities that are typically difficult to site, *such as* airports, state education facilities and state or regional transportation facilities . . . regional transit authority facilities . . . state and local correctional facilities, solid waste handling facilities, and inpatient facilities including substance abuse facilities, mental health facilities, group homes, and secure community transition facilities.

Former RCW 36.70A.200(1) (2013) (emphasis added).[1] "[E]ssential public facilities may be large or small, many or few, and may be either capital projects (e.g., airports and prisons) or uses of land

---

[1] A secure community transition facility is a conditional release facility for people convicted of sex offenses. RCW 71.09.020(16).

3

No. 55560-3-II

and existing structures (e.g., mental health facilities and group homes)." *Childs. All. & Low Income Hous. Inst. v. City of Bellevue*, No. 95-3-0011, 1995 WL 903168, at *6 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. July 25, 1995). "The characteristic they share is that they are essential to the common good, but their local siting has traditionally been thwarted by exclusionary land use policies, regulations, or practices." *Id.*

Growth management hearings boards "have exclusive jurisdiction to review petitions alleging a [local government] did not comply with the GMA in adopting or amending its comprehensive plan or development regulations." *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 569, 309 P.3d 673 (2013); *see also* RCW 36.70A.280(1)(a). If a board finds that a city is not compliant with the GMA, "the board shall remand the matter" to the city and "shall specify a reasonable time" for the city to comply with the GMA. RCW 36.70A.300(3)(b). Once the time to comply has expired, the board shall set a hearing to determine whether the city has achieved compliance. RCW 36.70A.330(1).

A.      The Initial Adoption of PMC 20.72 in PMO 3179

In March 2016, Puyallup imposed a 180-day moratorium on accepting, processing, or issuing any permits for "uses or activities associated with the operation of emergency shelters, drop-in centers, and any and all other similar land uses that provide social services to persons that

---

After the Board completed its review of this case, the legislature added "community facilities" to the list of essential public facilities and expressly excluded private prisons and jails. Former RCW 36.70A.200(1) (2013), *amended by* LAWS OF 2020, ch. 128, §1, LAWS OF 2021 ch. 265, § 2. A "community facility" is "a group care facility operated for the care of juveniles committed to the department [of children, youth, and families]." RCW 72.05.020(1). We cite to the current version of RCW 36.70A.200 in the remainder of this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55560-3-II

are homeless." Clerk's Papers (CP) at 464; PMO 3109. It renewed the moratorium at least four times.

Then in October 2018, Puyallup adopted PMO 3179, which added a new chapter to the city's municipal code—PMC 20.72. The new chapter regulated day use centers and overnight shelters that provided services and single-night accommodations for people experiencing homelessness. Former PMC 20.72.020 (2018). The municipal code defined both facilities:

> (1) "Daytime drop-in center" means a center which has a primary purpose of serving homeless individuals, whose clientele may spend time during day or evening hours, but with no overnight stays. Services may include counseling and/or medication monitoring on a formal or informal basis, personal hygiene supplies, facilities for showering, shaving, napping, laundering clothes, making necessary telephone calls and other basic supportive services. Centers may also provide meals or facilities for cooking.

> (2) "Overnight shelter" means a facility with overnight sleeping accommodations, the primary purpose of which is to provide temporary shelter for the homeless in general or for specific populations of the homeless. Temporary shelter facilities associated with disaster relief are excluded from this use category. Homeless drop-in center services may also be provided on the same site during daytime hours.

*Id.*; CP at 86-87. The ordinance enacted strict regulations on the siting and permit process for such facilities. It did not regulate longer-term transitional or permanent housing facilities. Former PMC 20.72.020(2).

Under the new code chapter, someone wishing to establish one of the regulated facilities had to seek out a conditional use permit or a development agreement. Former PMC 20.72.030(2) (2018). Facilities seeking a conditional use permit could be sited only in limited manufacturing districts. Former PMC 20.72.040 (2018). And buffer setbacks required that no portion of any facility could be "located within 1000 feet of a parcel containing" a list of "sensitive uses" that included noncollege schools, public parks and trails, public libraries, day care or preschool

5

No. 55560-3-II

facilities, "[s]pecial needs senior housing," and "[a]ny residentially-zoned parcel." CP at 89; former PMC 20.72.050(2) (2018). As a result, less than 200 acres of land across 42 parcels was available for conditional use permit siting for day use centers and overnight shelters, almost all of it clustered in an industrial area in the northwest of the City, separated from the downtown core by the Puyallup River. Most of the available land had poor access to mass transit and was accessible only by major arterial roads that had few or no sidewalks.

However, the new code chapter required that any regulated facility "shall be in general proximity to public transportation and shall have adequate on-site parking, unless sited in a zone district which would not otherwise have an off-street code parking requirement." CP at 89; former PMC 20.72.050(3) (2018). There were also extensive application requirements, including hosting a public meeting, mailing notice to every property owner within the relevant city council district, submitting an array of plans and subplans such as a code of conduct and safety and security plans, and convening an advisory committee to draft a binding good neighbor agreement. Former PMC 20.72.030, .060, .070 (2018).

The sole alternative to a conditional use permit subject to these zoning limitations was a development agreement negotiated with Puyallup's city council. Former PMC 20.72.030(2)(a). The city council could "by resolution accept or decline to negotiate a development agreement" to site a regulated facility. *Id.*; CP at 87. A facility seeking a development agreement would be subject to the same buffer setbacks and other application requirements as one pursuing a conditional use permit. Former PMC 20.72.050, .060, .070. The only difference between the two permit processes was that a development agreement would allow a facility to be sited in an area not zoned for limited manufacturing, if approved by a majority of the city council. Former PMC 20.72.030(2)(a), .040.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55560-3-II

Homeward Bound operated a day use center in central Puyallup that offered services including meals and phone and computer access, as well as connecting clients with housing, counseling, and treatment services. It also coordinated the Freezing Nights program, where local churches rotated in providing overnight shelter and meals for people experiencing homelessness each year from November through March. Homeward Bound's current operations were grandfathered in and not regulated by the new ordinance, but Homeward Bound would be subject to the new code requirements if the day use center moved. It is not apparent from our record what effect PMC 20.72 has had on the Freezing Nights program. Homeward Bound filed a timely petition for review of PMC 20.72 to the Board in December 2018.

B.      First Board Hearing and Order

1.      Arguments

Homeward Bound argued to the Board that the new PMC 20.72 was inconsistent with numerous policies in Puyallup's comprehensive plan. Homeward Bound also insisted that the new ordinance ran afoul of multiple GMA provisions, including the RCW 36.70A.200 prohibition on precluding the siting of essential public facilities. Counsel stated, "I'm not seeking a Board ruling that always, everywhere a center or shelter is an essential public facility, period, I'm trying to achieve an outcome specific to this case, this city, this record, because I believe the elements are present here." CP at 2139.

On this record, it does not appear that Homeward Bound sought official recognition as an essential public facility from Puyallup or Pierce County. Nor did Homeward Bound argue to the Board that the City lacked an adequate process for identifying local essential public facilities. Instead, it asserted that the City's planning commission had considered the possibility that centers

7

No. 55560-3-II

and shelters would constitute essential public facilities and drafted the ordinance to avoid precluding the facilities, before the city council departed from that draft by tightening the siting restrictions. The record before the Board included Homeward Bound's written comments to the city council, which stated, "The GMA requires that a city's Comprehensive Plan include a process identifying and siting 'essential public facilities,' which include those facilities which 'are typically difficult to site'" and that when "identifying [essential public facilities], cities and counties should take a 'broad view' of what constitutes a public facility." CP at 1032-33 (quoting RCW 36.70A.200(1)(a) and WAC 365-196-550(4)(b)(i)). But the record does not contain a request from Homeward Bound for the City to engage in a process to designate day use centers and overnight shelters as essential public facilities.

2.      Decision and order

The Board issued its decision and order in June 2019. The Board addressed three questions: "Do the development regulations implement the comprehensive plan goals and policies? Do any of the development regulation's features preclude achievement of any of the Comprehensive Plan policies? Have Petitioners shown actual conflict between Comprehensive Plan policies and the new developments regulations?" CP at 40 (boldface omitted). The Board focused "on the words of the Ordinance . . . and the words of the comprehensive plan policies" to analyze whether PMC 20.72 was consistent with the comprehensive plan. CP at 33-34. The ruling expressly avoided relying on facts that were in dispute.

a.      Essential public facilities

The Board concluded that PMC 20.72 did not violate any GMA requirements. The Board found that day use centers and overnight shelters serving people experiencing homelessness were

8

No. 55560-3-II

not expressly included as essential public facilities within the meaning of RCW 36.70A.200(1)(a). And the Board found that PMC 20.72 did not "substantially interfere with any GMA goal as required to support a determination of invalidity." CP at 55.

The Board acknowledged Homeward Bound's arguments that the facilities qualified as essential public facilities because they were publicly funded, "serve a public function[,] and are traditionally hard to site." CP at 51. The Board emphasized that although the planning commission had discussed the comprehensive plan policies that guide the siting of essential public facilities in Puyallup, "it is significant that the Petitioner did not challenge those policies but rather attempts to make the case that these facilities are [essential public facilities] because of attributes making them difficult to site." *Id.*

The Board further found that several of the uses identified in the statute, "'substance abuse facilities, mental health facilities, group homes, and secure community transition facilities'" modified the initial item, "'inpatient facilities.'" CP at 53 (quoting RCW 36.70A.200(1)(a)). The Board referred to its reasoning in *GEO Group, Inc. v. City of Tacoma*, that the absence of a specific statement *excluding* a facility from the list of essential public facilities in RCW 36.70A.200(1)(a) was not sufficient to *require including* the facility in the statute by inference. No. 18-3-0005, 2018 WL 9814549, at *5 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Sept. 20, 2018). And the Board distinguished several previous cases as not "squarely address[ing] the question of what constitutes" an essential public facility, or observing only in dictum "that a homeless encampment 'may very well constitute an essential public facility.'" CP at 52 (quoting *Peranzi v. City of Olympia*, No. 11-2-0011, 2012 WL 13180833, at *9 (W. Wash. Growth Mgmt. Hr'gs Bd. May 4, 2012). In sum, the Board declined to read centers and shelters serving people experiencing homelessness into the

9

No. 55560-3-II

statutory list: "While such uses may constitute an essential public facility, we simply do not have the authority to make public policy by adding words to the statute that are not there and cannot be reasonably inferred." CP at 53. Thus, the Board concluded that PMO 3179 did not preclude the siting of an essential public facility "as defined in state law." *Id.*

    b.   Comprehensive plan policies

The Board defined "[t]he facilities subject to this Ordinance" as "a daytime drop-in center, with the primary purpose of serving homeless individuals, and an overnight shelter, defined as a facility with sleeping accommodations the primary purpose of which is to provide temporary shelter that may occur in conjunction with the daytime drop-in facilities." CP at 43. The Board concluded that PMO 3179 was not inconsistent with several Puyallup Comprehensive Plan policies that Homeward Bound raised, such as LU-2.2 ("Encourage a range of housing types and densities to meet the needs of all economic sectors of the population.") or LU-22.2[2] ("Limit commercial uses in industrial areas to uses that are supportive of and incidental to industries and businesses."). CP at 42, 46 (boldface omitted). The Board emphasized that PMO 3179 addressed day use centers and overnight shelters, "not a permanent housing project" as contemplated by LU-2.2, or a commercial use within the purview of LU-22.2. CP at 43.

However, the Board found that PMO 3179 was inconsistent with several of the City's other comprehensive plan policies, triggering compliance proceedings. The Board did not consider the development agreement option "to offer any effective response to the Petitioner's assertions." CP at 42.

---

[2] Policy LU-21.2 was recodified and is now LU-22.2. *See* CP 1336. Because the language of the policy has not changed, we cite to the current version of the policy.

No. 55560-3-II

The Board found that PMC 20.72 failed to comply with several policies regarding housing for people with special needs, a term that includes people experiencing homelessness. The Board found PMC 20.72 was inconsistent with, failed to implement, precluded, and was in actual conflict with policies H-6, H-6.1, and H-6.2, which required Puyallup to "[p]romote a variety of housing for people with special needs, such as the elderly, disabled, homeless, and single householders;" "[e]ncourage and support the development of emergency, transitional and permanent housing with appropriate on-site services for persons with special needs;" and "[e]ncourage the distribution of special needs housing throughout the City, recognizing that some clustering may be appropriate if in proximity to public transportation, medical facilities, or other essential services." CP at 41 (boldface omitted).

The Board further found that PMC 20.72 conflicted with several policies addressing access to transit and pedestrian safety. The Board concluded that the new code chapter failed to implement, precluded, and was in actual conflict with policy LU-7.1, which instructed that "[c]ommunity services, including schools, community centers, and medical services, should be focused in central locations and/or near transit centers." CP at 43 (boldface omitted). And the Board concluded that PMC 20.72 did not comply with policies T-3.1 ("Ensure consistency between land use and the associated transportation system. . . . Coordinate land use and transportation plans and policies to ensure they are mutually supportive.") and T-4.4 ("Increase pedestrian safety, emphasize connectivity, and reduce operations and maintenance costs through developing walkways. . . . Prioritize pedestrian facilities in the vicinity of schools, retail districts, community centers, health care facilities, parks, transit stops and stations, and other pedestrian generators."). CP at 47 (boldface omitted). The Board explained that the City "taking a use which

11

No. 55560-3-II

is largely pedestrian or transit oriented and siting it in an area that is neither pedestrian nor transit friendly . . . certainly cannot be said to be consistent with these policies." CP at 48.

Homeward Bound timely petitioned for review of the Board's decision, arguing the order violated constitutional provisions, was an erroneous interpretation or application of the law, was not supported by substantial evidence, failed to decide all issues requiring resolution, was "inconsistent with a rule of the agency," and was arbitrary and capricious. CP at 26.

C.      PMO 3195 and Compliance Proceedings

1.      Drafting of PMO 3195

Puyallup took steps to come into compliance with the comprehensive plan. Puyallup considered several options for revising the siting restrictions. Some options would permit siting via conditional use permit in general commercial, community business, and medical zones. Other options reduced most buffer setbacks to 500 feet but retained the 1,000-foot buffers for schools (excluding colleges), day care centers, and preschools.

During a city council meeting, council members reaffirmed that PMC 20.72 was not intended to apply to more permanent housing for people who were transitioning out of homelessness, only to shelters and day use centers.

The final version of PMO 3195 added siting availability for shelter and day centers in the general commercial and community business zones and reduced the buffer setbacks to 500 feet for all sensitive uses except school, day care, and preschool uses. The ordinance allowed siting of centers and shelters on 191 parcels totaling 417 acres, with new areas in the northeast and southwest of Puyallup, as well as a small area near the central business district. Most of the added

12

No. 55560-3-II

parcels abutted or were located near bus routes, and many of the parcels could be accessed by roads with defined sidewalks.

2.     Compliance hearing

The Board then had to determine whether the PMO 3195 amendments brought PMC 20.72 into compliance with the GMA and the comprehensive plan. Homeward Bound argued to the Board that the code remained inconsistent with the same comprehensive plan policies. It claimed that PMC 20.72's restrictions applied to "any facility, with overnight sleeping accommodations, the primary purpose of which is to provide temporary shelter for the homeless," and posited that the chapter would regulate a landlord with a duplex who offered housing to people experiencing homelessness, in addition to single-night shelters. CP at 2894. Puyallup answered Homeward Bound's definitional argument by stating that the City's intent was to regulate "institutional use" shelters, not residential units serving as permanent residences or longer-term residences intended to transition people out of homelessness into permanent housing. CP at 2896.

Homeward Bound also contended that even though the amendments would permit siting of day use centers and overnight shelters closer to downtown, the available parcels still were not centralized enough. In response, Puyallup emphasized that the added parcels had greatly increased pedestrian and transit access. "The locations where the zoning has been added here, the [general commercial] and [community business districts] are designated as such because of their centrality." CP at 2885.

3.     Compliance order

The Board issued its order on compliance in December 2019. The Board analyzed the amended version of PMC 20.72 adopted under PMO 3195 with the same three questions, asking

13

No. 55560-3-II

whether the municipal code failed to implement, precluded achievement of, or was in actual conflict with the GMA or any of the City's comprehensive plan policies.

The Board concluded that the amended code was consistent with the comprehensive plan policies addressing special needs housing due to the increased availability of potential sites throughout Puyallup. It found that Puyallup's comprehensive plan did not "require or imply that all types of special needs housing must be allowed in all zones throughout the City . . . . [I]t is not incumbent upon the City, based on its Plan policies, to encourage daytime drop-in centers and overnight shelters in all districts." CP at 14. The Board further stated that the decision to prohibit centers and shelters in residential and medical zones without a development agreement was within the city council's "prerogative absent a comprehensive plan mandate." *Id.*

The Board rejected Homeward Bound's assertion that the ordinance regulated temporary housing for people transitioning out of homelessness, because "[d]rop-in centers do not include overnight stays and overnight shelters are defined as temporary." CP at 15. The City's explanation that transitional housing was not included in the definitions of "overnight shelters" under the code was "entitled to some weight." *Id.*

The Board also found that expanding the available area beyond the limited manufacturing zone satisfied the Board's concerns regarding access to transit and pedestrian safety. "'Community services,' including drop-in centers and overnight shelters, are now allowed in more centralized locations. Pedestrian safety has been increased and there is greater consistency between such uses and the transit transportation system." *Id.*

Finally, the Board acknowledged that the availability of development agreements, which could allow a center or shelter to be sited in additional zones, provided further flexibility. The

14

No. 55560-3-II

Board concluded that PMC 20.72 as amended by PMO 3195 was consistent with the City's comprehensive plan and the GMA.

Homeward Bound timely petitioned for judicial review, arguing in relevant part that the compliance order was an erroneous interpretation or application of the law, was not supported by substantial evidence, failed to decide all issues requiring resolution, and was arbitrary and capricious.[3]

The superior court consolidated Homeward Bound's two petitions for judicial review. The superior court affirmed both the initial order and the compliance order. Homeward Bound appeals.

ANALYSIS

When drafting the GMA, the legislature instructed growth management hearings boards reviewing local government decisions to afford the localities deference "in how they plan for growth, consistent with the requirements and goals of [the GMA]." RCW 36.70A.3201. "[W]hile this chapter requires local planning to take place within a framework of state goals and requirements, the ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community." *Id.*

In its review, a board presumes that a city's development regulation is valid, and it is the petitioner's burden to demonstrate otherwise. RCW 36.70A.320(1), (2). "The board shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3).

---

[3] Homeward Bound has since abandoned arguments that the orders violated the constitution, were the result of unlawful procedures or processes, or were inconsistent with agency rules.

15

No. 55560-3-II

Local governments must frequently balance mutually competitive goals. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 173 Wn. App. 310, 333, 293 P.3d 1248 (2013). Thus, if a local development regulation "meaningfully advances other comprehensive plan goals and policies, a finding by the growth board that it fails to advance another" goal or policy cannot by itself "be an invalidating inconsistency." *Id*. The board must defer to "local planning processes," and "where, within the constraints of the GMA, more than one appropriate planning choice exists, boards must defer to a [local jurisdiction's] discretion." *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155-56, 256 P.3d 1193 (2011); *see also Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 498, 139 P.3d 1096 (2006).

Chapter 34.05 RCW, Washington's Administrative Procedure Act, governs judicial review of board actions. *Whatcom County v. Hirst*, 186 Wn.2d 648, 666, 381 P.3d 1 (2016). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

The GMA "is not to be liberally construed." *Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 342, 190 P.3d 38 (2008). "[W]hile the [b]oard must defer to [the jurisdiction's] choices that are consistent with the GMA, the [b]oard itself is entitled to deference in determining what the GMA requires." *Lewis County*, 157 Wn.2d at 498. "But the [board's] interpretation does not bind us." *Spokane County*, 176 Wn. App. at 565. Overall, it is not a reviewing court's role to determine the correct planning decision; we review only whether the board's action was supported under the relevant standard of review. *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 768, 793, 193 P.3d 1077 (2008).

No. 55560-3-II

RCW 34.05.570(3) provides nine grounds for relief from a board's adjudicatory order. Relevant to this case, a court shall grant relief from a board's order if the court determines that the board "has erroneously interpreted or applied the law," the order "is not supported by evidence that is substantial when viewed in light of the whole record before the court," the board did not decide "all issues requiring resolution," or "[t]he order is arbitrary or capricious." RCW 34.05.570(3)(d)-(f), (i).

Courts review alleged misinterpretations of the law de novo. *Kittitas County*, 172 Wn.2d at 155. We review allegations that a board's order is not supported by substantial evidence "by determining whether there is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Id*. (internal quotation marks omitted) (quoting *Thurston County*, 164 Wn.2d at 341). We must remand if a board fails to decide an issue within its purview. *Suquamish Tribe v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 156 Wn. App. 743, 776, 235 P.3d 812 (2010). And we review a claim that a board's order is arbitrary and capricious "by determining whether the order represents 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.'" *Kittitas County*, 172 Wn.2d at 155 (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46-47, 959 P.2d 1091 (1998)).

I. ESSENTIAL PUBLIC FACILITIES

A.     Interpretation of RCW 36.70A.200

"No local comprehensive plan or development regulation may preclude the siting of essential public facilities." RCW 36.70A.200(5). RCW 36.70A.200(1)(a) provides:

17

No. 55560-3-II

> The comprehensive plan of each county and city that is planning under [the GMA] *shall include* a process for identifying and siting essential public facilities. Essential public facilities include those facilities that are typically difficult to site, *such as* airports, state education facilities and state or regional transportation facilities . . . regional transit authority facilities . . . state and local correctional facilities, solid waste handling facilities, and inpatient facilities including substance abuse facilities, mental health facilities, group homes, [juvenile detention] community facilities . . . and secure community transition facilities.

(Emphasis added.)

Homeward Bound argues the Board erroneously concluded that centers and shelters serving people experiencing homelessness are not essential public facilities. It claims the plain language of RCW 36.70A.200(1)(a) indicates that homeless centers and shelters could be considered essential public facilities because they are hard to site. And Homeward Bound asserts that the Board misapplied rules of statutory construction by interpreting the list in RCW 36.70A.200(1)(a) to be exclusive instead of illustrative. Homeward Bound also contends that the recent amendments to RCW 36.70A.200 and prior board decisions indicate that facilities not listed in the statute can qualify as essential public facilities. Homeward Bound asks this court to use guidelines in the Department of Commerce's regulation, WAC 365-196-550, that encourage local governments to interpret the term broadly, to determine whether centers and shelters are essential public facilities.

Puyallup responds that RCW 36.70A.200 authorizes *the City* to identify additional essential public facilities through its comprehensive plan, but the statute does not grant the Board the authority to do so unless a petitioner challenges the City's comprehensive plan policies addressing essential public facilities. "Homeward's use is not one that every local government

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55560-3-II

*must* treat as an [essential public facility], although a local government *can* decide to do so." City of Puyallup's Resp. Br. at 46 (some emphasis added).

Puyallup emphasizes that Homeward Bound has never attempted to use Puyallup's process for identifying and siting essential public facilities, which the City acknowledges must be available under the City's comprehensive plan pursuant to RCW 36.70A.200(1)(a). Puyallup further notes that prior board decisions cited by Homeward Bound concerned facilities expressly named as essential public facilities in RCW 36.70A.200(1)(a). In sum, Puyallup argues that if a facility is in a category specifically listed as an essential public facility in RCW 36.70A.200(1)(a), then the Board can find noncompliance as a matter of law if a comprehensive plan or local regulation precludes their siting. But if the type of entity at issue is not specifically listed, under the statute only the local governments can implement their discretionary "process for identifying and siting essential public facilities." RCW 36.70A.200(1)(a).

In its reply brief, Homeward Bound asserts for the first time that Puyallup has not adopted an adequate process for identifying essential public facilities. Puyallup's "'process' is, at most, a statement delaying the creation of such a process to the still-distant future," "meaning not until 'years 2026-2030.'" Reply Br. of Appellant at 22 (quoting CP at 1340).

We must "accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues." *City of Redmond*, 136 Wn.2d at 46. "It is valid for an agency to 'fill in the gaps' via statutory construction as long as the agency does not effectively amend the statute." *Quinault Indian Nation v. Imperium Terminal Servs., LLC*, 187 Wn.2d 460, 474, 387 P.3d 670 (2017) (quoting *Hama Hama Co. v. Shorelines Hr'gs Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975)). And we recognize that boards must grant local jurisdictions

19

No. 55560-3-II

discretion in the implementation of their comprehensive plans. *Spokane County*, 173 Wn. App. at 333.

Homeward Bound failed to ask the City below to implement its process for determining whether day use centers and shelters are essential public facilities. Although the statutory list of essential public facilities is nonexclusive, we agree with the Board that in these circumstances, it did not have authority to mandate that day use centers and overnight shelters be classified as essential public facilities.

1.      Prior board identifications of essential public facilities

RCW 36.70A.200(1)(a) states, "Essential public facilities include" several listed types of facilities. Counties and cities planning under the GMA must also develop in their comprehensive plans "a process for identifying and siting" facilities "such as" those in the express statutory list. Thus, the statute grants *local jurisdictions* the authority to identify essential public facilities that are not included in the statutory list. RCW 36.70A.200(1)(a). The statute also requires that local governments "shall" have a process for evaluating whether a public facility is an essential one. *Id.*

Unlike local jurisdictions, growth management hearings boards "'do not have authority to make public policy even within the limited scope of their jurisdictions, let alone to make statewide public policy.'" *Thurston County*, 164 Wn.2d at 353 (emphasis omitted) (internal quotation marks omitted) (quoting *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 129, 118 P.3d 322 (2005)). "The hearings boards are quasi-judicial agencies that serve a limited role under the GMA, with their powers restricted to a review of those matters specifically delegated by statute." *GEO Grp., Inc. v. City of Tacoma*, No. 18-3-0005, 2019 WL 4451060, at *4 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Sept. 9, 2019). And "boards 'do not have jurisdiction to decide challenges to site-specific

20

No. 55560-3-II

land use decisions because [those] decisions do not qualify as comprehensive plans or development regulations.'" *Spokane County*, 176 Wn. App. at 570 (alteration in original) (quoting *Woods v. Kittitas County*, 162 Wn.2d 597, 610, 174 P.3d 25 (2007)).

Thus, a growth management hearings board may decide whether a type of facility is included in the RCW 36.70A.200(1)(a) list of essential public facilities as a matter of law, but the board may not encroach on the local government's authority under the GMA to otherwise exercise local discretion to identify and site individual essential public facilities. A local jurisdiction must establish procedures for identifying essential public facilities, and the local government is the entity that determines whether a particular facility is an essential public facility if not specifically listed. RCW 36.70A.200(1)(a).

In several cases, growth management hearings boards have classified specific facilities as belonging to categories of facilities named in the statutory list as a matter of law. For example, the light rail is an essential public facility because it is a regional transportation facility. *Cent. Puget Sound Reg'l Transit Auth. v. City of Tukwila*, No. 99-3-0003, 1999 WL 33100213, at *1 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Sept. 15, 1999). Indeed, "any railroads with facilities, such as trackage, [rail yards] and intermodal centers, that serve the region or state, as a matter of law, constitute state or regional transportation facilities and therefore are essential public facilities." *Hapsmith v. City of Auburn*, No. 95-3-0075c, 1996 WL 650324, at *29 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. May 10, 1996) (boldface omitted). And work release centers are essential public facilities because they fit within the definition of "correctional facilities" on the list. *Wash. Dep't of Corrs. v. City of Tacoma*, No. 00-3-0007, 2000 WL 35544196, at *4 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Nov. 20, 2000). Similarly, in *Cascade Bicycle Club v. City of Lake Forest Park*,

21

No. 55560-3-II

the board agreed with King County that the Burke-Gilman Trail constituted a regional transportation facility under the statutory list. No. 07-3-0010c, 2007 WL 2340878, at *9-10 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. July 23, 2007).

The board has considered WAC 365-196-550 in prior cases. Through WAC 365-196-550, the Department of Commerce has provided guidance for identifying essential public facilities, and WAC 365-196-550(4)(b)(i) recommends that cities and counties broadly define "public facilities." But the essential public facility WACs are persuasive, not binding, authority. *See* WAC 365-196-030(2) (stating that Department of Commerce guidelines are "recommendations for meeting the requirements of the [GMA]" and that the department "does not set a minimum list of actions or criteria that a county or city must take").

The board turned to WAC 365-196-550 for guidance in *Puget Western, Inc. v. City of North Bend* on the question of whether truck parking constituted essential public facilities, after noting that such facilities were not defined as such by RCW 36.70A.200, King County, the city of North Bend, or the Washington State Department of Transportation. No. 16-3-0001, 2016 WL 7339317, at *4 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Nov. 21, 2016). But upon consideration, the board "decline[d] to stand in the place of the legislature or [Washington State Department of Transportation]" and found that truck parking was not an essential public facility. *Id*. at *5.

Finally, in a recent case, *GEO Group*, the superior court remanded to the board for a determination of whether the Northwest Detention Center, a federal immigration detention center, was an essential public facility when considering WAC 365-196-550's guideline criteria. 2019 WL 4451060, at *1, 3. The board explained on remand that the Northwest Detention Center does not fit within the express list of facilities in the GMA because it is a federal—not a state, regional,

22

No. 55560-3-II

or local—detention facility. *Id.* at \*4-5. The statute therefore does not *require* the detention center to be identified as an essential public facility. *Id.* at \*5. But "the legislature left open the possibility that such a facility could be identified as an [essential public facility]" *by a city or county* "pursuant to a process adopted to satisfy RCW 36.70A.200(1) and (2)." *Id.*

    2.    <u>Essential public facilities under RCW 36.70A.200</u>

It does not appear from our record that Homeward Bound ever asked *Puyallup* to identify centers and shelters serving people experiencing homelessness as essential public facilities under its comprehensive plan. Instead, it sought a designation from *the Board* that centers and shelters constitute essential public facilities under the GMA as a matter of law "because they serve a public function and are traditionally hard to site." CP at 446. Homeward Bound also asked the Board to apply the reasoning in *Cascade Bicycle Club* to rule that centers and shelters were essential public facilities, even though the criteria in that case were specific to King County's comprehensive plan. On appeal, Homeward Bound relies on the superior court's remand instructions in *GEO Group* to argue that the Board should have relied on WAC 365-196-550 to classify centers and shelters as essential public facilities. *See* 2019 WL 4451060, at \*1, 3. We disagree.

First, the Board found "center/shelter use not to be an essential public facility" as a matter of law because it "doesn't fit within the state's definition for [essential public facilities] that jurisdictions must accommodate." CP at 45. And the Board explained, "'[S]ubstance abuse facilities, mental health facilities, group homes, and secure community transition facilities'" modified the initial description, "'inpatient facilities.'" CP at 53. Homeward Bound does not argue that centers and shelters regulated by the ordinances constitute inpatient facilities. And it would

23

No. 55560-3-II

not have been appropriate for the Board to "effectively amend" the statute. *Quinault Indian Nation*, 187 Wn.2d at 474.

The Board also stated, "While [center and shelter uses] may constitute an essential public facility, we simply do not have the authority to make public policy by adding words to the statute that are not there and cannot be reasonably inferred." CP at 53. Homeward Bound does not convincingly argue that, as a matter of law rather than as a matter of local discretion, shelters and day use centers for people experiencing homelessness *must* be identified as essential public facilities under the statutory language. To do so would encroach on local authority that the legislature specifically granted to cities and counties. This reasoning is consistent with the board's decision postremand in *GEO Group*, where the board concluded that the federal immigration detention facility was "not an essential public facility as a matter of law" but could be designated an essential public facility as a matter of local discretion. *See* 2019 WL 4451060, at *5.

We recognize that local governments, when faced with a requirement that they exercise discretion as to whether and how to site day use centers and overnight shelters for people experiencing homelessness, may be tempted to make the locality an unappealing place for them to settle. In recent years, many local governments have shifted toward policies that penalize people experiencing homelessness, perhaps hoping that they will choose another place to live. For example, a national survey found that between 2006 and 2016, the number of "city-wide bans on camping in public increased by 69 percent; city-wide bans on begging increased by 43 percent; city-wide bans on standing around increased by 88 percent; and bans on sitting or lying down increased by 52 percent." Sara K. Rankin, *Punishing Homelessness*, 22 NEW CRIM. L. REV. 99,

24

No. 55560-3-II

109-10 (2019). Bans on sleeping in vehicles increased by 143 percent in that same time period. *Id.* at 110.

"Psychiatric disorders affect at least 30 to 40 percent of all people experiencing homelessness." *Id.* at 105. And experiencing homelessness "exacerbates stress-related diseases affecting mental health and addiction," as well as illnesses that require strict or intensive treatment such as Hepatitis C and HIV/AIDS. Morgan Chandegra, *And It's Beginning to Snow*, 56 CAL. W. L. REV. 425, 428 (2020). Because moving shelters for individuals experiencing homelessness out of city cores inherently increases the difficulty of accessing medical, economic, and other services, we recognize that separating people from the services they need can be another strategy for creating an environment that is hostile to people experiencing homelessness.

We also recognize that local governments are subject to competing interests, and there are strong incentives to appease businesses and local residents by moving services for people experiencing homelessness out of business districts and downtown cores. When drafting PMC 20.72, Puyallup's city council received many comments from residents and local businesses posing strong opposition to the siting of *any* services for people experiencing homelessness within Puyallup, and the city attorney had to explain that the City could not legally expel Homeward Bound's current operation. One emblematic commentator implored the city council to pass a restrictive ordinance: "[Y]our constituents as a whole want you to stand up for them, not the minority of people that are causing problems. Please take care of the people that pay the bills here, keep the lights on, and that want a safe place to live." CP at 1232.

In sum, we recognize that local legislative bodies, as well as advocates who want to provide services for people experiencing homelessness in a city, will often have to navigate a difficult local

No. 55560-3-II

process, but that is the system that the legislature currently contemplates. It is the legislature, not the Board, that must expand the statutory list of essential public facilities if it wishes to establish overnight shelters and day use centers are essential public facilities as a matter of law, removing discretion from local governments. The legislature has otherwise left the identification of facilities that are not expressly identified in the statute to local government discretion.

We hold that the Board did not erroneously interpret RCW 36.70A.200 when it concluded that day use centers and overnight shelters for people experiencing homelessness were not essential public facilities under the statute as a matter of law.

3.    Essential public facilities within Puyallup

We agree with Homeward Bound that RCW 36.70A.200(1)(a) provides a nonexclusive list, and the statute contemplates that counties and cities *must* have a process for further identifying and siting essential public facilities in their comprehensive plans. *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 310, 197 P.3d 1153 (2008). But in this case, despite challenging PMC 20.72 as noncompliant with more than a dozen comprehensive plan policies, Homeward Bound did not ask the City below to implement a process for determining whether shelters or day use centers should be designated as essential public facilities, nor did Homeward Bound argue to the Board that Puyallup had improperly denied such a request. In fact, our record contains no information about Puyallup's process for identifying essential public facilities, or how a facility would seek recognition as one, outside of the following comprehensive plan policies:

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55560-3-II

> LU-34 Establish a process to identify and site essential public facilities on the list maintained by the State Office of Financial Management.[4]
>
> LU-34.1 Allow siting of essential public facilities consistent with the Growth Management Act, Pierce County Comprehensive Plan and the Countywide Planning Policies.
>
> LU-34.2 Establish siting criteria to encourage location of services near transit hubs, protect surrounding uses and mitigate impacts of any specific facility to the neighborhood and the City.
>
> LU-34.3 Maintain a process to site essential public facilities that requires consistency of the proposed facility with Puyallup's Comprehensive Plan; emphasizes public involvement; identifies and minimizes adverse impacts; and promotes equitable location of these facilities throughout the city, county, and state.

PUYALLUP COMPREHENSIVE PLAN at 3.21 (2015) (boldface omitted). These comprehensive plan policies acknowledge the City's obligation to establish a process for identifying and siting essential public facilities, but they do not provide any information about what the process actually is. At oral argument, Puyallup asserted that it had established the foundation of such a process in its municipal code, directing this court to PMC 20.11.006(6)(b). That provision does nothing more than state that a 120-day time limit for a "final decision on a project permit application," "does not apply" if the application "[r]equires the siting of an essential public facility as provided in RCW 36.70A.200." PMC 20.11.006(6)(b). We are dismayed that the City appears to have neglected to adopt a functional process for identifying essential public facilities that are not expressly identified in the statutory list as the GMA requires.

Homeward Bound could have petitioned Puyallup to designate day use centers and overnight shelters as essential public facilities under the City's local discretion and then appealed

---

[4] The Washington State Office of Financial Management "shall maintain a list of those essential state public facilities that are required or likely to be built within the next six years." RCW 36.70A.200(4).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55560-3-II

any denial to the Board. Further, if the City's process for responding to such a request was inadequate or otherwise problematic, Homeward Bound could have challenged the actual process the City applied. Unfortunately, here, Homeward Bound did not ask Puyallup to identify day use centers and overnight shelters as essential public facilities. And Homeward Bound did not challenge the adequacy of the provisions in the City's comprehensive plan addressing essential public facilities until its reply brief before this court in this case, leaving us with no record on which we could decide this issue.

In sum, at the very least, RCW 36.70A.200(1)(a) contains a *nonexclusive* list of essential public facilities, and the statute requires the City to adopt and apply a process for identifying essential public facilities not specifically listed in the statute. And the City must do so within a reasonable time. It is possible that had Homeward Bound proved a failure to develop an adequate process for identifying essential public facilities as required by RCW 36.70A.200(1)(a), the Board, the superior court, or this court could have provided a remedy. But that issue is not properly before this court today. At best, Homeward Bound asked the Board to declare that day use centers and overnight shelters constitute essential public facilities, which is a determination that must be made by the local government through the process developed in its comprehensive plan.

Because Homeward Bound never insisted below that *the City* perform a process for identifying further essential public facilities and the Board lacked authority to declare shelters and day use centers to be essential public facilities as a matter of law, we affirm the Board's ruling. The Board's decision was not legally erroneous or arbitrary and capricious. Nor was the Board incorrect when it declined to encroach on the City's authority and, thus, the Board did not ignore issues it was required to resolve.

28

No. 55560-3-II

B.       PMC 20.72 Is Not Preclusive

Even if day use centers and overnight shelters were classified as essential public facilities, Homeward Bound does not show on this record that PMC 20.72 precludes their siting.

As used in RCW 36.70A.200(5), "'preclude' means to 'render impossible or impracticable.'" *City of Airway Heights v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 193 Wn. App. 282, 313, 376 P.3d 1112 (2016) (quoting *City of Des Moines v. Puget Sound Reg'l Council*, 108 Wn. App. 836, 847, 988 P.2d 27 (1999)). In *City of Airway Heights*, the city council rezoned land near two essential public facilities, a military base and an airport, to permit residential development. *Id.* at 287-88. The growth management hearings board ruled that the rezoning precluded the siting or expansion of an essential public facility in violation of RCW 36.70A.200(5) by limiting the ability to construct additional runways and impeding aircraft approach and departure operations. *Id.* at 303-04. Division Three reversed the board's preclusion ruling, stating that although the ordinances were incompatible with the military base's ability to carry out missions, under the preclusion standard "there is little or no evidence that the challenged ordinances would render impossible or impracticable" the military base's and airport's operations. *Id.* at 313. Similarly, in *City of Des Moines*, Division One held that permitting and mitigation requirements in the city's comprehensive plan that would increase the cost of adding a third runway to SeaTac Airport, which was an essential public facility, did not preclude the siting of the runway. 108 Wn. App. at 847.

Here, PMC 20.72 allows day use centers and overnight shelters to be sited on almost 200 parcels on over 400 acres through conditional use permits. The permitting and application requirements may make siting such facilities more costly, but not impracticable. Homeward Bound has not established that any of the prerequisites for obtaining a conditional use permit for a day

29

No. 55560-3-II

use center or overnight shelter are more onerous than the barriers in *City of Airway Heights* or *City of Des Moines* such that they render siting impracticable. Thus, even if centers and shelters were essential public facilities, PMC 20.72 does not preclude their siting.

II. CONSISTENCY WITH COMPREHENSIVE PLAN POLICIES

A.    Policies Related to Housing

1.    Policies regarding special needs housing

Puyallup's comprehensive plan contains policies addressing housing for people experiencing homelessness:

> H-6    Promote a variety of housing for people with special needs, such as the elderly, disabled, homeless, and single householders.
> H-6.1   Encourage and support the development of emergency, transitional and permanent housing with appropriate on-site services for persons with special needs.
> H-6.2   Encourage the fair distribution of special needs housing throughout the City, recognizing that some clustering may be appropriate if in proximity to public transportation, medical facilities, or other essential services.

PUYALLUP COMPREHENSIVE PLAN at 4.12 (boldface omitted).

Homeward Bound insists that the Board erred by concluding that amendments to PMC 20.72 under PMO 3195 corrected the City's prior noncompliance with these housing policies. It claims that by continuing to prohibit granting conditional use permits for shelters in residential zones and retaining the same definition of "shelters,"[5] PMC 20.72 "continues to segregate Shelters from all other residential uses, regardless of their comparable size, number of occupants, or . . . the intensity of their use." Br. of Appellant at 26. "For example, PMC 20.72 prohibits a duplex or

---

[5] Both ordinances define an "overnight shelter" as "a facility with overnight sleeping accommodations, the primary purpose of which is to provide temporary shelter for the homeless in general or for specific populations of the homeless." CP at 86-87.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

triplex intended to provide temporary housing to homeless families from being located in [residential] zones that otherwise allow duplexes or triplexes outright." *Id.* Homeward Bound also argues the code is still inconsistent with policies regarding special needs housing because it "permits the siting of a Shelter in only two primary clusters and a handful of additional scattered sites on the fringes of the City" and clusters potential sites away from mass transit and other essential services. *Id.* at 32. It asks this court to "reverse the Board's finding of compliance as arbitrary, erroneous, and unsupported by substantial evidence." *Id.* at 29. We decline to do so.

The Board initially found PMC 20.72 noncompliant with the comprehensive plan policies addressing special needs housing. At the compliance hearing, the Board specifically examined the scope of the facilities regulated to clarify whether PMC 20.72 affected transitional housing or residential treatment facilities. Puyallup repeatedly argued at the compliance hearing that the chapter was not intended to regulate treatment facilities, permanent residences, or transitional housing. And the City emphasized that "[t]he available area" for siting centers and shelters via conditional use permits "has been substantially increased." CP at 2850.

Homeward Bound countered that the expanded acreage was insufficient given that "[n]o parcels are allowed in the downtown business district." CP at 2871. And it claimed that the ordinance referred to "any facility, with overnight sleeping accommodations, the primary purpose of which is to provide temporary shelter for the homeless." CP at 2894. Puyallup distinguished Homeward Bound's duplex hypothetical at the compliance hearing by stating that the city council's intent was to regulate "an institutional use and not someone [who] decides to give someone down on their luck a place to stay for a few days." CP at 2896-97. Puyallup also noted

No. 55560-3-II

before the Board that a development agreement could permit siting a center or shelter in a residential zone.

The Board found that the comprehensive plan's housing policies did not "require or imply that all types of special needs housing must be allowed in all zones throughout the City. . . . [I]t is not incumbent upon the City, based on its Plan policies, to encourage daytime drop-in centers and overnight shelters in all districts." CP at 14.

The decision to restrict centers and shelters from being sited in residential and medical zoning districts was within the bounds of the city council's duty as a local legislative body to balance competing interests. *Spokane County*, 173 Wn. App. at 333. Similarly, a city's interpretation of its own municipal code is entitled to some deference, and the legislative history here contains extensive discussion about limiting the facilities regulated by PMC 20.72 to a narrow set of institutions that did not include food banks, permanent residential units, transitional housing, or temporary encampments.

We hold that the Board did not err as a matter of law by giving weight to Puyallup's intent to regulate a narrow set of facilities versus broadly prohibit any institution involved in assisting people experiencing homelessness. Additionally, the Board's conclusion was supported by evidence that would convince a fair-minded person of the truth of the matter, and was not willful or unreasoning. Therefore, the Board's ruling was supported by substantial evidence and was not arbitrary and capricious.

2.      Policy to encourage a range of housing types

Puyallup's comprehensive plan policy LU-2.2 also directs the City to "[e]ncourage a range of housing types and densities to meet the needs of all economic sectors of the population."

No. 55560-3-II

PUYALLUP COMPREHENSIVE PLAN LU-2.2, at 3.13. Homeward Bound contends that the Board's ruling in its initial decision that PMC 20.72 complied with this policy was an erroneous application of the law, not supported by substantial evidence, and arbitrary and capricious. We disagree.

The Board ultimately ruled that PMO 3195 brought PMC 20.72 into compliance with the policy addressing special needs housing. Because we affirm that conclusion above, we also hold that the amendments to PMC 20.72 adopted in PMO 3195 complied with the broader policy addressing all housing types. Thus, the Board did not erroneously interpret or apply the law and the amended version of PMC 20.72 was not inconsistent with the policy to encourage a range of housing types.

Homeward Bound further asserts that there is no evidence in the record that the general policy addressing housing was limited to permanent housing projects. "Likewise, while the Board in no way defined a 'permanent housing project,' it apparently found that an overnight shelter could not constitute such a project." Br. of Appellant at 22. The interpretation of the term "housing" is a legal question, not one that we review for substantial evidence. And Homeward Bound has not identified a legal error in concluding that overnight shelters are not permanent housing projects.

Finally, Homeward Bound contends that "the Board's application of a permanency limitation to [the policy to encourage a range of housing types] was unreasoned, uncited, unexplained, and not based on argument made to the Board, thus rendering it arbitrary and capricious." *Id.* at 23. But Puyallup argued in its briefing to the Board that the centers and shelters were not a type of housing within the meaning of the policy, and there is evidence in the record from the city council's meetings that longer-term housing to transition people out of homelessness

33

No. 55560-3-II

was not within the scope of PMC 20.72. The Board gave due consideration to Puyallup's process and the effects of the ordinance. Thus, the Board's decision was not arbitrary and capricious.

B.      Policies Regarding Access to Transit and Pedestrian Safety

Homeward Bound challenged PMO 3195's amendments to PMC 20.72 under several comprehensive plan polices regarding transportation. First, policy LU-7.1 provides, "Community services, including schools, community centers, and medical services, should be focused in central locations and/or near transit centers." PUYALLUP COMPREHENSIVE PLAN LU-7.1, at 3.14. Policy T-3.1 calls for the City to "[e]nsure consistency between land use and the associated transportation system" by coordinating "land use and transportation plans and policies to ensure they are mutually supportive." *Id.* T-3.1, at 7.29. And policy T-4.4 directs the City to "[i]ncrease pedestrian safety, emphasize connectivity, and reduce operations and maintenance costs through developing walkways," and "[p]rioritize pedestrian facilities in the vicinity of schools, retail districts, community centers, health care facilities, parks, transit stops and stations, and other pedestrian generators." *Id.* T-4.4, at 7.31.

Homeward Bound argues the Board erred by concluding that PMC 20.72 as amended by PMO 3195 complied with the policies addressing access to transit and pedestrian safety. It claims that the fact that none of the available parcels are within 1,000 feet of Puyallup's two transit centers is fatal to the ordinance's compliance with policy LU-7.1. And it asserts that the degree of increased centralization, public transit access, and pedestrian safety of the available parcels is insufficient. We disagree.

We expect growth management hearings boards to respect local jurisdictions' discretion in the implementation of their comprehensive plans. *Spokane County*, 173 Wn. App. at 333. A

34

No. 55560-3-II

reviewing court will give substantial weight to a board's interpretation of the GMA, but this deference "is superseded by the GMA's statutory requirement that boards give deference to [local] planning processes." *Kittitas County*, 172 Wn.2d at 154.

The Board found that allowing centers and shelters in two additional types of zoning districts addressed the Board's concern that the limited manufacturing zone "lacked pedestrian and public transportation access." CP at 15 (footnote omitted). Although there were clear transit access issues with PMO 3179, PMO 3195 opened up many new parcels with better access to mass transit and defined sidewalks. And although many of the parcels did border the edges of the City, a small cluster was made available in the central general commercial zoning district. No longer is the overwhelming majority of the available land located in a light industrial zone separated from the City by a river. This supports the Board's assessment that "[p]edestrian safety has been increased and there is a greater consistency between such uses and the transit transportation system." CP at 15.

The Board was required to presume compliance and grant deference to Puyallup's local planning processes. RCW 36.70A.320(1), .3201. It is clear from the record that the city council felt pressure from many angles in their decision-making and council members were seeking to craft a solution that would satisfy multiple competing community needs and concerns without running afoul of the GMA. We hold that the Board did not err as a matter of law by finding in the compliance order that PMC 20.72 ultimately complied with the comprehensive plan policies regarding transit access.

35

No. 55560-3-II

C.        Policy Limiting Commercial Uses in Industrial Zones

Puyallup's comprehensive plan policy LU-22.2 calls for the City to "[l]imit commercial uses in industrial areas to uses that are supportive of and incidental to industries and businesses." PUYALLUP COMPREHENSIVE PLAN LU-22.2, at 3.19.

Homeward Bound argues that the Board's ruling in its initial decision that PMC 20.72 was consistent with the policy on limiting commercial uses in industrial zones was an erroneous application of the law, not supported by substantial evidence, and arbitrary and capricious. Homeward Bound draws analogy to *Peranzi*, where "the [b]oard ruled that an Olympia ordinance permitting homeless encampments in a light industrial zone was inconsistent with Olympia's similar [comprehensive plan] policy limiting non-industrial uses in industrial districts." Br. of Appellant at 19. And it insists that centers and shelters are commercial uses under the plain language of the ordinance. We disagree.

1.        Definition of "commercial use"

"Interpretation of local ordinances is governed by the same rules of construction as state statutes." *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 471, 61 P.3d 1141 (2003). We must "reasonably construe ordinances" in light of their purpose. *Id.* at 472. If the plain language of an ordinance is unambiguous, we will not construe the ordinance to mean something different. *Ellensburg Cement Prods., Inc. v. Kittitas County*, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014).

Puyallup's municipal code in PMC 20.15.005 defines "[c]ommercial use, general" as "a use that involves the purchase, sale, lease, rental, repair or other transaction involving the handling of any article, service, substance or commodity commonly used for consumer or household use." A list of typical uses includes "consumer services enterprises (laundries, dry cleaners, shoe repair,

36

No. 55560-3-II

appliance and electronic repair, tailoring, printing shops and photo finishing, etc.), shopping centers or malls, food stores and supermarkets, health spas and studios, hotels and motels, indoor theaters, and restaurants." PMC 20.15.005. "'General commercial uses' may be profit or nonprofit and are typically conducted entirely within an enclosed building." *Id.*

Homeward Bound has repeatedly compared this case to *Peranzi*, which resulted from a challenge to an ordinance that permitted a permanent homeless encampment as a conditional use in a light industrial park. 2012 WL 13180833, at *1. There, the growth management hearings board found the ordinance did not comply with comprehensive plan policies requiring Olympia to "[l]imit non-industrial uses in industrial districts to those uses which complement or support industrial development" and "[p]rohibit land uses in industrial districts which would be incompatible with existing or potential industrial uses." 2012 WL 13180833, at *6-7 (boldface omitted). *Peranzi* is distinguishable—the comprehensive plan policies in that case addressed the broad category of "non-industrial uses." *Id*. Here, the policy in question addresses only commercial uses in industrial zones. PUYALLUP COMPREHENSIVE PLAN LU-22.2, at 3.19.

Notably, Homeward Bound argued before the Board that the day use centers were a commercial use immediately after asserting that overnight centers constituted a residential use. On appeal, it now contends that the provision of temporary shelter and supplies for people experiencing homelessness constitutes a "transaction involving the handling of any article, service, substance or commodity commonly used for consumer or household use" under PMC 20.15.005. Br. of Appellant at 17 (emphasis omitted). The definition of "commercial use" under PMC 20.15.005 requires a "purchase, sale, lease, rental, repair or other transaction." The common sense

No. 55560-3-II

definition of "transaction" requires an exchange, usually of goods, services, or money. The plain language of PMC 20.15.005 is not ambiguous. *Ellensburg Cement Prods.*, 179 Wn.2d at 743.

2. Application to day use centers and overnight shelters

Homeward Bound did not offer any evidence that it charges money for the services, items, and shelter it provides. It is distinguishable from an institution such as Goodwill Industries for example, which is a nonprofit organization that conducts many transactions each day as it sells items through its thrift stores to fund its charitable operations. *See, e.g.*, *Goodwill Ind. of the Columbia Willamette v. State of Wash. Dep't of Rev.*, No. 62543, 2005 WL 2799267, at *1-2 (Wash. Bd. of Tax Appeals Sept. 26, 2005).

We hold that the Board did not erroneously interpret the law when it concluded that shelters and day use centers are not commercial uses. Moreover, viewing the evidence in the light most favorable to Puyallup, we hold that there is a sufficient quantity of evidence to convince a fair-minded person that centers and shelters for people experiencing homelessness are not commercial uses to which policy LU-22.2 applies. *Kittitas County*, 172 Wn.2d at 155.

Homeward Bound argues the Board's decision was arbitrary and capricious due to the Board's "failure to address its own *Peranzi* decision and summary dismissal of [Homeward Bound's] arguments as not 'credible.'" Br. of Appellant at 20. As discussed above, *Peranzi* is distinguishable as addressing broad "non-industrial uses" versus the specific "commercial uses" language at issue in this case. 2012 WL 13180833, at *6-7. Thus, the Board's ruling was not willful and unreasoning.

No. 55560-3-II

We hold that the Board's decision and order was not inconsistent with the policy limiting commercial uses in industrial zones, was supported by substantial evidence, and was not arbitrary and capricious.

D.     Development Agreement Option

Homeward Bound argues the Board's compliance order improperly relied on the development agreement option in PMC 20.72 to which the Board had previously declined to afford weight. We disagree.

The Board did not mention development agreements in the compliance order until the second-to-last paragraph of its analysis, stating that the development agreement option "potentially serves to increase the availability of sites." CP at 16. Although the option "in the absence of any centrally located areas in which shelter facilities were permitted outright" was insufficient, "the existence of this option . . . may offer an opportunity for additional sites." *Id.* The Board found PMC 20.72 in compliance based on the expanded availability of siting and only raised development agreements as a further positive consideration. It was not an error of law for the Board to note that development agreements allowed for additional siting opportunities beyond the conditional use permit siting restrictions.

No. 55560-3-II

We affirm both of the Board's orders.

Glasgow, C.J.

We concur:

Cruser, J.

Veljacic, J.